# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

**LUIS VASQUEZ,**
        **Plaintiff,**

    v.                               **Case No. 17-C-766**

**JOEL RIGUEUR, _et al.,_**
        **Defendants.**

_____

## DECISION AND ORDER

Plaintiff Luis Vasquez, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I allowed him to proceed on claims that the defendants were deliberately indifferent to his serious medical and mental health needs. The defendants filed motions for summary judgment, which are fully briefed and ready for my decision. I will grant the defendants' motions and dismiss this case.

## I.  BACKGROUND[1]

The plaintiff is incarcerated at Waupun Correctional Institution. Docket No. 21 at ¶ 1. The defendants are: 1) Dr. Joel Rigueur, a psychiatrist who contracts with the Department of Corrections (DOC); 2) Dr. Salam Syed, who works for the DOC; 3) Nancy White, a retired registered nurse who worked as the manager of Waupun's health

---

[1] Facts in this section are taken from "Defendants Syed and White's Proposed Findings of Fact" (Docket No. 21); "State Defendants' Additional Proposed Findings of Fact" (Docket No. 51); "Defendant Joel Rigueur, M.D.'s Proposed Findings of Fact" (Docket No. 28); "Plaintiff's Declaration in Response and in Opposition to Rigueur, Syed, White and Anders's Motion for Summary Judgment" (Docket No. 60); "Plaintiff's Second Declaration in Response to Defendants' Motions for Summary Judgment" (Docket No. 61); and Rigueur's response to the plaintiff's declaration (Docket No. 68). Because the plaintiff did not dispute the defendants' proposed facts, those facts are deemed admitted for purposes of summary judgment. Civil L.R. 56(b)(4).

services unit from September 2016 until May 2017; and 4) Dr. Jeffrey Anders, the DOC's Psychiatry Director. *Id.* at ¶ 2; Docket No. 51 at ¶ 69; Docket No. 28 at ¶ 2.

The time period relevant to this case is August 23, 2016, through March 20, 2017. Docket No. 21 at ¶ 4. Prior to that time, the plaintiff was under the care of Dr. Todd Callister (a psychiatrist who is not a defendant). Docket No. 28 at ¶ 10. The plaintiff had last seen Dr. Callister on April 26, 2016. *Id.* Dr. Callister reported that the plaintiff had a history of depression and anti-social personality disorder and that the plaintiff was taking medication with no reported side effects. *Id.* Specifically, the plaintiff was taking Duloxetine (also called Cymbalta), which is taken to treat Major Depressive Disorder and Generalized Anxiety Disorder, and Buspirone, which is taken to treat anxiety. *Id.* Dr. Callister also noted that the plaintiff had suffered sexual abuse as a child and had ongoing symptoms of traumatic re-experiencing. *Id.*

The plaintiff had last seen his psychologist, Dr. Torria Van Buren (who is not a defendant), on April 26, 2016. Docket No. 28 at ¶ 11. According to her report, the plaintiff had been diagnosed in part with Major Depressive Disorder and Anti-Social Personality Disorder. *Id.* The plaintiff also had a history of suicidal ideation and poor institutional adjustment, which included fighting with staff and inmates and inciting a riot. *Id.* The plaintiff told Dr. Van Buren that he had flashbacks and intrusive thoughts, leading him to believe he suffered from PTSD. *Id.* Dr. Van Buren decided to continue to monitor the plaintiff for trauma-related symptoms. *Id.* She did not diagnose the plaintiff with PTSD.

Dr. Rigueur saw the plaintiff for the first time on August 23, 2016, for a psychiatric evaluation after reviewing the reports of Dr. Callister and Dr. Van Buren. Docket No. 21 at ¶ 7. The plaintiff asserts that, at that appointment, he told Dr. Rigueur about his

childhood, specifically that he had been physically and sexually abused. Docket No. 68 at ¶ 4. The plaintiff notes that he told Dr. Rigueur he was having nightmares once or twice a week and that he would often wake up screaming or wrestling with his blankets. *Id.* The plaintiff states that Dr. Rigueur dismissed his statements and informed him that he had not been diagnosed with PTSD and that he should continue to work with his psychologist. *Id.* at ¶ 5. Dr. Rigueur disputes that they discussed PTSD symptoms at this meeting. *Id.* at ¶ 6. He notes that the plaintiff has elsewhere conceded that he did not discuss his need for PTSD treatment until *after* his initial meeting with Dr. Rigueur. *Id.* According to the plaintiff, he told Dr. Rigueur that this psychologist was not treating his nightmares or his other symptoms. *Id.* At the plaintiff's request, Dr. Rigueur maintained the plaintiff's dosage of Duloxetine, increased his dosage of Buspirone, and prescribed Trazadone at bedtime and Atomoxetine to address the plaintiff's reported sleep disturbances. *Id.* at ¶ 19; Docket No. 21 at ¶ 9.

One week later, on August 31, 2016, the plaintiff prepared a health services request (HSR), requesting Dr. Rigueur to stop his Buspirone and Trazadone. Docket No. 28 at ¶ 22. He asserted that the medications were exacerbating his migraines and causing insomnia. *Id.* The plaintiff also stated that, when he tried to stop taking the medications, he started having withdrawal symptoms and impulsive, violent behavior. *Id.* He explained that, when he restarted the medications, the withdrawal and side effects stopped, but his migraines returned. *Id.* The plaintiff did not mention PTSD or alleged symptoms of trauma in his HSR. Docket No. 68 at ¶ 12.

Dr. Rigueur did not receive the plaintiff's HSR because nursing staff triage HSRs. Docket No. 21 at ¶ 12; Docket No. 28 at ¶ 31, 46. If a nurse deems an HSR to be urgent,

the patient will be scheduled to be seen as soon as possible, typically within twenty-four hours by a nurse or mental health professional. Docket No. 21 at ¶ 13. The nurse who triaged the plaintiff's August 31st HSR noted on the HSR that she referred the request to the psychiatrist, meaning that the plaintiff was likely placed on a waiting list to see the psychiatrist at the next available time. *Id.* at ¶¶ 14-15. Nurses can flag an HSR to be reviewed by the psychiatrist on a more immediate basis, but there is no indication that occurred with the plaintiff's August 31st HSR. *Id.* at ¶ 16.

Dr. Rigueur explains that he does not control what patients he sees on any given day unless the HSU manager informs him of an emergency. Docket No. 28 at ¶ 6. He states that he is given the medical records of each patient that he is scheduled to see that particular day, but those records do not include HSRs. *Id.* at ¶ 7. HSRs are shared with him at the discretion of health services staff. *Id.* at ¶ 8.

A few weeks later, on September 19, 2016, the plaintiff sent another HSR to health services. Docket No. 28 at ¶ 23. The plaintiff again requested to see Dr. Rigueur and stated that he wanted to stop the Buspirone and Trazadone because they were causing frequent and persistent migraines. *Id.* The nurse who triaged the HSR responded that his request had been referred to the psychiatrist and that he was on the list to be seen. *Id.*

A little more than a week later, on September 30, 2016, Dr. Syed examined the plaintiff in response to complaints of a urinary issue. Docket No. 28 at ¶ 24. At the appointment, the plaintiff reported that his urinary issues had resolved but he complained of headaches and migraines that he thought were a result of the psychiatric medications he was taking. Docket No. 21 at ¶ 28. The plaintiff told Dr. Syed that his headaches had been going on for years and he had a history of migraines. *Id.* at ¶ 29.

Dr. Syed explains that, when a patient is under the care of a psychiatrist, he generally does not interfere with the psychiatrist's prescribed medications. Docket No. 21 at ¶ 30. He informed the plaintiff that a small percentage of people who take Buspirone develop headaches; he deferred to the plaintiff's psychiatrist what medication was proper to treat the plaintiff's psychiatric conditions. *Id.* at ¶ 32. Dr. Syed explains that it was not necessary for him to refer the plaintiff to see his psychiatrist because he was seeing him on a regular basis and, according to the September 19th HSR response, he was on a list to see him again soon. *Id.* at ¶ 33.

In response to the plaintiff's complaints of headaches, Dr. Syed prescribed ibuprofen and started the plaintiff on 1000mg of Tylenol, once per day as need. Docket No. 21 at ¶¶ 35-36. Dr. Syed also explained to the plaintiff that his blood pressure was high, which could cause headaches. *Id.* at ¶ 36. Dr. Syed offered the plaintiff blood pressure medication, but he declined to take it. *Id.* at ¶ 38. He ordered weekly blood pressure checks and a chart review in four weeks to monitor the issue. *Id.* at ¶ 39. Dr. Syed continued the plaintiff's prescription of Excedrin, which he was already receiving to treat his migraines. *Id.* at ¶ 40. Dr. Syed did not increase the plaintiff's dosage of Excedrin; the plaintiff was already receiving the maximum dosage allowed by DOC policy. *Id.* at ¶ 41.

A little more than a week after seeing Dr. Syed, on October 9, 2016, the plaintiff submitted another HSR asking to see Dr. Rigueur and complaining about his migraines, which he attributed to the Buspirone and Trazadone. Docket No. 28 at ¶ 25. The HSR discussed these symptoms as a side effect of the medication; it did not relate the

symptoms to PTSD. Docket No. 68 at ¶17. Health services responded that the complaint had been referred to the psychiatrist. Docket No. 28 at ¶ 25.

The next day, on October 10, 2016, the plaintiff met with his psychologist, Dr. Kristina de Blanc. Docket No. 28 at ¶ 26. He told her that he was having nightmares about four time per week and persistent migraines, which made it hard for him to sleep. *Id.* Dr. de Blanc recorded that the plaintiff looked like he was in significant pain from a migraine. *Id.* at ¶ 27. She informed health services of the migraines and the possibility that they were related to the plaintiff's psychotropic medication. *Id.* She also noted that the plaintiff was placed on a list to consult with the psychiatrist. *Id.* Dr. de Blanc's report does not diagnose PTSD; it indicates only that she addressed the plaintiff's complaints of medication reactions. Docket No. 68 at ¶ 14.

Four days later, on October 14, 2016, Dr. Rigueur performed a psychiatric evaluation of the plaintiff. Docket No. 28 at ¶ 28. After reviewing Dr. Syed's and Dr. de Blanc's reports and at the plaintiff's request, Dr. Rigueur discontinued the Buspirone and Trazadone. *Id.* at ¶ 29. He explains that he tries to act cooperatively and collaboratively in prescribing medications because it prompts voluntary usage by the patient. *Id.* at ¶ 45. He also explains that, in light of the plaintiff's history, he would have wanted to see the plaintiff in person before deciding to discontinue medications or start new medications. *Id.* at ¶ 44. The plaintiff asserts that he told Dr. Rigueur that he needed treatment for nightmares and other symptoms of PTSD, but Dr. Rigueur sat there in silence. Docket No. 68 at ¶¶ 18-19. Dr. Rigueur disputes that they discussed PTSD; instead, he asserts that their discussion focused on the medication the plaintiff had been prescribed. *Id.*

Dr. Rigueur asserts that he does not believe the plaintiff's migraines were caused by the increased dosage of Buspirone. Docket No. 28 at ¶ 35. He explains that the plaintiff had been taking Buspirone for a long time without incident and the increase in dosage was minor. *Id.* at ¶ 35. He also notes that the plaintiff had been dealing with migraines for a very long time. *Id.* Dr. Rigueur also discounts the plaintiff's assertion that he suffered withdrawal symptoms when he stopped taking Buspirone and Trazadone within a week of Dr. Rigueur's prescription. *Id.* at ¶ 36. Dr. Rigueur explains that those medications would not cause withdrawal symptoms because they do not induce dependence, especially in such a short amount of time. *Id.* at ¶ 37.

Dr. Rigueur prescribed Tegretol (also called Carbamazepine) in place of the discontinued medications to help address the plaintiff's complaints of nightmares, impulsivity, and rage. Docket No. 28 at ¶ 37; Docket No. 68 at ¶¶ 19-20. Dr. Rigueur also requested that health services schedule a follow-up appointment for four weeks later. Docket No. 68 at ¶ 20. He placed the order for Tegretol that same day, and health services sent a notice to the plaintiff to stop taking Buspirone and Trazadone. Docket No. 28 at ¶ 30. Dr. Rigueur explains that he does not have access to the medication room and is unable to provide medication directly to his patients. *Id.* at ¶ 66. The plaintiff did not receive the medication until ten days later. *Id.* at ¶ 51. He asserts that he experienced withdrawal symptoms as a result of the delay. *Id.*

Health services failed to schedule the follow-up appointment requested by Dr. Rigueur. Docket No. 68 at ¶ 29. Dr. Rigueur explains that he does not personally manage his schedule; health services is responsible for scheduling requested appointments. *Id.*

A little less than three months later, on January 17, 2017, the plaintiff submitted an HSR asking to be referred to a psychiatrist to stop Tegretol because he was gaining weight in his stomach and chest, developing "man boobs," had diarrhea with dark green stool, dry mouth, unusual movement of his eyelids, and extreme drowsiness. Docket No. 28 at ¶ 52. Health services responded that it would refer his request to the psychiatrist. *Id.*

About a week later, Dr. Van Buren, the plaintiff's psychologist, met with the plaintiff. Docket No. 28 at ¶ 53. Dr. Van Buren's report indicates that the plaintiff told her he was experiencing a depressed mood on and off but said he was currently feeling ok. *Id.* The plaintiff denies telling her he was ok, although there is no dispute that this is recorded in her report. Docket No. 68 at ¶ 31. According to her report, he also said he was having nightmares of prior trauma and was increasingly irritated with other inmates and noise. Docket No. 28 at ¶ 53. Dr. Van Buren decided to continue to monitor the plaintiff and schedule him to take the "Trauma Symptom Index-2" in a few weeks. *Id.* Dr. Van Buren met with the plaintiff again on February 21, 2017, while he was in segregation. *Id.* at ¶ 57. She noted that the plaintiff reported having nightmares, but he did not say that he was punching and kicking walls. Docket No. 21 at ¶ 61. Dr. Van Buren talked to the plaintiff about potential group therapy, gave him information about depression, and told him to file a psychological services request next time he wanted to be seen. *Id.* at ¶ 62; Docket No. 28 at ¶ 57.

On March 1, 2017, the plaintiff submitted an HSR reminding health services of his January 17th request that the Tegretol be discontinued because it was not working and he was having unwanted side effects. Docket No. 28 at ¶ 58. The plaintiff requested that

he see the psychiatrist "for appropriate medication treatment" and that the DOC hire more psychiatrists to prevent further delay. Docket No. 68 at ¶ 39. The plaintiff indicated that he had filed two previous HSRs on this issue, but there is no record of additional HSRs being filed. Docket No. 21 at ¶ 67.

About a week later, White informed the plaintiff that he had been scheduled to see the psychiatrist. Docket No. 28 at ¶ 59. White does not remember when she first learned that the plaintiff was complaining of violent behavior caused by his medication, but she recalls that, once she learned about that, she promptly brought it to Dr. Rigueur's attention. Docket No. 21 at ¶¶ 66, 68. The plaintiff was taken health services on March 13, 2017, to see Dr. Rigueur, but when he got there, he learned that the appointment had been canceled. Docket No. 28 at ¶ 59.

The next day, on March 14, 2017, Dr. Rigueur discontinued the Tegretol based on the plaintiff's desire to stop taking it. Docket No. 28 at ¶ 60. Dr. Rigueur met with the plaintiff about a week later, on March 20, 2017. *Id.* at ¶ 61. The plaintiff informed Dr. Rigueur that he was having nightmares, flashbacks, and felt depressed. *Id.* He also indicated that he was having thoughts of self-harm, was not sleeping well, and was having cold sweats and nightmares. *Id.* He also explained that he was thinking about his childhood trauma. *Id.* Dr. Rigueur noted that the plaintiff had a history of recurrent major depressive disorder, and he concluded that, with his newly reported signs and symptoms, the plaintiff met the criteria for PTSD. *Id.* at ¶ 62. He decided to treat him accordingly. *Id.* That same day he entered medication orders to treat the plaintiff's depression and help him sleep. *Id.*

Defendant Dr. Jeffrey Anders is the DOC Psychiatry Director. Docket No. 51 at ¶ 69. One of his duties is to act as the reviewing authority for inmate complaints. *Id.* at ¶ 71. He is the decision maker at the institution level; he reviews the recommendations of the inmate complaint examiner and either affirms or dismisses the inmate's complaint. *Id.*

Dr. Anders reviewed four complaints filed by the plaintiff about his psychiatry care during the relevant time period. Docket No. 51 at ¶ 72. Dr. Anders reviewed the first complaint on November 8, 2016. *Id.* The plaintiff had complained about the delay in seeing a psychiatrist to adjust his medication. The inmate complaint examiner had rejected the complaint because the plaintiff was seen by Dr. Rigueur the day after he received the complaint. *Id.* Dr. Anders affirmed this rejection because the plaintiff was seen and his medication was changed as he had requested. *Id.* at ¶ 73.

Also on November 8, 2016, Dr. Anders reviewed a second complaint filed by the plaintiff. *Id.* at ¶ 77. That complaint alleged that the plaintiff had been subjected to a "policy or practice of psychiatric staff shortage." *Id.* Dr. Anders spoke to Dr. Rigueur about the plaintiff's complaint. *Id.* at ¶ 78. Dr. Anders decided to dismiss the complaint because it did not appear to him that during the delay, the plaintiff required urgent psychiatric care. *Id.* at ¶ 79. In other words, the delay did not constitute denial of appropriate psychiatric care because the plaintiff suffered no harm as a result of the delay. *Id.* Further, Dr. Anders noted that then-current psychiatric coverage was inadequate to provide follow-up psychiatric appointments immediately after an inmate requests one. *Id.* at ¶ 80.

Dr. Kevin Kallas (who is not a defendant), the DOC's Mental Health Director, explains that there was and continues to be a statewide shortage of psychiatric providers in all healthcare systems, including the DOC healthcare system. Docket No. 51 at ¶ 81.

Dr. Kallas explains that the DOC has been and continues to be engaged in aggressive recruiting efforts to eliminate that shortage. *Id.* at ¶ 82. The DOC has sent direct mailings to Wisconsin Psychiatrists and Wisconsin Family Practice physicians who may have interest in prescribing psychotropic medication. *Id.* at ¶ 83. It has also created a psychiatric advanced practice nurse practitioner limited-term employee position that pays more than the primary care nurse practitioner positions. *Id.* at ¶ 84. It is also reaching out to psychiatry residents in training at both UW-Madison and Medical College of Wisconsin to discuss employment opportunities within the DOC's facilities after their training. *Id.* at ¶ 85. And, finally, it is contracting with various Locum Tenens agencies to provide contracted psychiatric coverage to facilities and, most recently, has begun contracting with Medefis, an organization that serves as a clearing house for dozens of psychiatric agencies across the country. *Id.* at ¶ 86. Even with the higher rate paid to these contracted psychiatric care providers, providing complete coverage to all of the DOC institutions is challenging. *Id.*

On November 21, 2016, Dr. Anders reviewed the plaintiff's third inmate complaint, which complained about a ten-day delay in receiving medication prescribed by Dr. Rigueur. Docket No. 51 at ¶ 87. Dr. Anders affirmed the rejection of this complaint because, by the time of his review, the plaintiff had started his new medication, so no intervening action was required. *Id.* at ¶ 88.

On March 27, 2017, Dr. Anders reviewed the plaintiff's complaint that, because of the psychiatric shortage, he was unable to get an appointment to adjust his medication. Docket No. 51 at ¶ 89. Dr. Anders noted that health services had triaged the plaintiff's HSR and determined that the plaintiff's requests for an appointment were not of an urgent

nature. *Id.* Dr. Anders asserts that, after reviewing the plaintiff's HSRs, he agreed with health service's assessment. *Id.* at ¶ 92. Further, by the time Dr. Anders reviewed the plaintiff's complaint, Dr. Rigueur had seen the plaintiff and had adjusted his medications, so no further intervention by Dr. Anders was required. *Id.* at ¶ 93.

Dr. Anders asserts that, based on the information available to him at the time he reviewed each of the plaintiff's complaints, he does not believe the plaintiff suffered any harm as a result of the delay caused by the DOC's shortage in psychiatric coverage. Docket No. 51 at ¶ 97.

## II. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). For the purposes of deciding defendants' motions, I resolve all factual disputes and make all reasonable factual inferences in favor of the plaintiff, who is the non-moving party. *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008).

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prove a deliberate-indifference claim, a plaintiff must first show that he has "a medical condition 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would perceive the need for a doctor's attention.'" *Edwards v. Snyder*, 478 F.3d 827, 830-31(7th Cir. 2007) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). He must then show "that the prison official[s] knew of 'a substantial risk of harm to [him] and disregarded the risk.'" *Id.* at 831 (first quoting *Greeno*, 414 F.3d at 653; and then citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Defendants do not dispute that the plaintiff suffered from an objectively serious medical condition, so my analysis will focus only on whether the defendants were deliberately indifferent to the plaintiff's condition. I will address each defendant in turn.

## A. Nurse Nancy White

The plaintiff argues that White was deliberately indifferent to his serious mental health condition when she delayed scheduling him for an appointment with Dr. Rigueur after he complained about side effects he was experiencing from the medication Tegretol. Dr. Rigueur prescribed Tegretol on October 14, 2016; the plaintiff first requested a psychiatric appointment on January 17, 2017, at which time he complained of non-serious side effects (*e.g.*, weight gain, diarrhea, dry mouth, drowsiness). White states that, to her knowledge, she did not review the plaintiff's HSR. Docket No. 23 at ¶ 13. A different nurse triaged the HSR and noted that the request was referred to the psychiatrist. The plaintiff provides no evidence to support an inference that White reviewed the October 14th HSR or that, even if she did review it, his non-serious side effects warranted an immediate appointment with the psychiatrist.

On February 14, 2017, the plaintiff sent a letter to the health services manager complaining about his migraine medication (he did not mention Tegretol or the side effects he was experiencing); White responded to the letter. *Id.* ¶ 14. On February 27, the plaintiff

sent another letter to the health services manager, in which he indicated that he wanted to see the psychiatrist because he believed Tegretol was causing him to have violent nightmares and behavioral problems. *Id.* at ¶ 15. Health services received the letter on March 2; on March 8, White sent a letter to the plaintiff, telling him that he was scheduled to see the psychiatrist the following week on March 13. *Id.* at ¶ 15.

The plaintiff questions why White delayed reviewing his letter by nearly a week and further delayed making the appointment; he argues that this delay is evidence of deliberate indifference. White asserts that she does not remember the exact date when or the exact manner how she first became aware that the plaintiff believed Tegretol was causing violent behavior, but she does remember that, as soon as she was aware of the plaintiff's concerns, she brought them to the attention of Dr. Rigueur and scheduled the plaintiff for the first available appointment. Docket No. 23 at ¶ 16. The March 13th appointment was canceled by Rigueur; however, that was through no fault of White's. She points to the fact that Rigueur discontinued the Tegretol on March 14 as evidence of the fact that she promptly brought the plaintiff's concerns to Rigueur's attention.

No reasonable jury could conclude that White was deliberately indifferent to the serious risk of harm the plaintiff faced. White testifies that she promptly referred the plaintiff's complaints of serious side effects to Dr. Rigueur and scheduled him for the first available appointment. The plaintiff offers no evidence to rebut her testimony. White had no control over Dr. Rigueur's schedule. She could not require that he be present at the institution more often than the two days per week his schedule allowed. All she could do was flag the information for him promptly after learning about it. Because nothing in the record supports a conclusion that she did not do this, no jury could conclude that she was

deliberately indifferent to the plaintiff's condition. Accordingly, White is entitled to summary judgment.

## B. Dr. Salam Syed

Dr. Syed saw the plaintiff on September 30, 2016, in response to complaints of a urinary issue. At that appointment, the plaintiff complained of headaches and migraines, which, despite having a long history of headaches and migraines, he attributed to the psychiatric medications he was taking. The plaintiff argues that Dr. Syed was deliberately indifferent to the pain he was experiencing. No reasonable jury could reach that conclusion.

Dr. Syed decided to defer to the plaintiff's psychiatrist with regard to the plaintiff's psychiatric medications. To treat the plaintiff's head pain, he prescribed ibuprofen and a high dosage of Tylenol once per day as needed. He also informed the plaintiff that his blood pressure was high, which can sometimes cause headaches. He offered blood pressure medication, but the plaintiff declined to take it. Dr. Syed also maintained the plaintiff's dosage of Excedrin, which was already at the highest level allowed by the DOC. Finally, the plaintiff had noted that he had complained to health services and requested an appointment with Dr. Rigueur. Dr. Syed trusted that health services would triage the plaintiff's request and, if necessary, schedule an appointment for the plaintiff. It was not Dr. Syed's job to schedule psychiatric appointments. The plaintiff had an appointment with Dr. Rigueur two weeks later.

No reasonable jury could conclude that "no minimal competent professional" would have responded in the way that Dr. Syed responded. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The plaintiff desired a different response from Dr. Syed, but, without

more, his disagreement with Dr. Syed's decision is insufficient to establish a claim under the Eighth Amendment. Accordingly, Dr. Syed is entitled to summary judgment.

**C. Dr. Jeffrey Anders**

The plaintiff was allowed to proceed on a personal- and an official-capacity claim against Dr. Anders. As to his personal-capacity claim, the plaintiff argues that Dr. Anders demonstrated deliberate indifference to his serious mental health needs when he affirmed the inmate complaint examiner's recommendations that the plaintiff's inmate complaints be rejected and/or dismissed. There is no dispute that Dr. Anders was not personally involved in treating the plaintiff.

Dr. Anders reviewed four inmate complaints during the relevant time period. For three of those complaints, after investigating the plaintiff's assertions, he determined that no further intervention was necessary because the plaintiff had received the medication and/or psychiatric appointments that he was requesting. For the fourth, in which the plaintiff complained about being harmed by a "policy or practice of psychiatric staff shortage," Dr. Anders reviewed the plaintiff's HSRs and spoke to the plaintiff's psychiatrist to determine if the plaintiff had been harmed by the delay. Dr. Anders acknowledged the delay caused by the shortage in psychiatric care, but he noted that the plaintiff's needs had been correctly triaged by nursing staff as non-urgent, and therefore the delay the plaintiff experienced did not harm him. Accordingly, Dr. Anders concluded that no intervention by him was required.

Based on the evidence, the only reasonable conclusion a jury could reach is that Dr. Anders did his job as the reviewing authority: he investigated the plaintiff's complaints by reviewing the relevant records and consulting with the plaintiff's providers. "This type

of response cannot be equated with deliberate indifference." *Greeno v. Daley*, 414 F.3d 645, 657 (7th Cir. 2005).

As to the plaintiff's official-capacity claim, the plaintiff argues that he continues to be harmed by the shortage of psychiatric providers within the DOC. The plaintiff has not presented evidence from which a reasonable jury could reach such a conclusion. First, the plaintiff has not sufficiently explained how his current psychiatric needs are not being met. His medication has been adjusted as requested, and he has been diagnosed with and is being treated for PTSD. While the defendants all acknowledge that there is insufficient coverage to provide inmates with immediate follow-up appointments, this is not enough on its own for the plaintiff to establish that he is being harmed. In addition, the DOC explains that it is attempting to address the shortage with aggressive recruiting efforts and that it schedules appointments with psychologists and medical providers in an attempt to meet the needs of inmates who have to wait to see a psychiatrist. In short, because the plaintiff has provided no evidence of an on-going violation of his rights, no jury could reasonably find that he is entitled to any relief.

Finally, I agree with Dr. Anders that the plaintiff's medical malpractice claim against him must be dismissed. Under Wisconsin law, "[a] claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis.2d 507. As already discussed, the plaintiff has presented no evidence to suggest that Dr. Anders breached his duty to investigate the plaintiff's allegations. Further, even if Dr. Anders had breached such a duty, the plaintiff offers no evidence to suggest that he was harmed by such a breach. As noted by Dr. Anders, by the time he had

reviewed the plaintiff's complaints, the plaintiff had received the requested medication and/or psychiatric appointments. And, to the extent the plaintiff did not receive what he asked for as quickly as he asked for it, the plaintiff was not harmed by the delay nor was Dr. Anders responsible for the delay. Accordingly, Dr. Anders is entitled to summary judgment on the plaintiff's claims.

## D. Dr. Joel Rigueur

The plaintiff argues that Dr. Rigueur's delay in (1) diagnosing him with PTSD, (2) discontinuing medication that resulted in unwanted side effects, or (3) scheduling appointments with the plaintiff demonstrate that Dr. Rigueur was deliberately indifferent to his serious mental health needs. For the reasons explained below, I find that Dr. Rigueur is entitled to summary judgment on the plaintiff's claims.

First, the plaintiff argues that Dr. Rigueur should have diagnosed him with PTSD much sooner than he did. The plaintiff argues that, from the beginning, he presented signs and symptoms consistent with PTSD, yet Dr. Rigueur disregarded them, delaying the treatment the plaintiff needed by nearly seven months.

A prisoner's disagreement with a medical professional's exercise of their medical judgment, without more, is insufficient to establish a claim for deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Dissatisfaction with a prescribed course of treatment rises to the level of a constitutional violation only if the medical treatment "is so blatantly inappropriate as to evidence intentional mistreatment to likely aggravate the prisoner's condition" or the provider's decisions are "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate

that the [provider] actually did not base the decision on such a judgment. *Id.*; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

Dr. Rigueur met with the plaintiff on August 23, 2016, October 14, 2016, and March 20, 2017. Given the high volume of patients he sees and the limited time he is at the institution, he is not able to review prisoners' HSRs. Instead, nursing staff, psychologists, and nurse practitioners triage the HSRs and, if they deem it necessary, they schedule an inmate to see him. Dr. Rigueur states that he does not typically receive copies of HSRs and there is no indication in his records that he received any of the plaintiff's HSRs. As such, the information he based his determinations on were limited to what he and the plaintiff discussed at the plaintiff's appointments.

The plaintiff and Dr. Rigueur disagree about the exact signs and symptoms that the plaintiff raised at his appointments. However, the parties agree that, at the first appointment, Dr. Rigueur diagnosed the plaintiff with (among other things) major depressive disorder in partial remission, anti-social disorder, and migraines. The parties also agree that, at the plaintiff's request and in an attempt to address these diagnoses, Dr. Rigueur increased the dosage of his anti-anxiety medication and prescribed another medication to help him sleep.

At the plaintiff's second appointment, Dr. Rigueur discontinued two of the plaintiff's prescriptions and prescribed a different prescription in their place to address the plaintiff's complaints of migraines and sleep disturbances. The plaintiff requested that the medications be discontinued because he believed they were the cause of his symptoms. Dr. Rigueur explains that he did not believe the medications were causing the plaintiff's

symptoms, but he agreed to try a different medication because he likes to work collaboratively with his patients to encourage voluntary usage of their medication.

Finally, on March 14, 2017, Dr. Rigueur discontinued the newly prescribed medication because he learned from health services that the plaintiff was complaining of serious side effects, including thoughts of self harm and violence. Dr. Rigueur saw the plaintiff in person less than a week later. He asserts that it was at that appointment that he learned about the additional signs and symptoms that the plaintiff had been complaining about in various HSRs, including thoughts of self-harm, distressing nightmares, and thoughts of childhood trauma. With these additional symptoms, Dr. Rigueur explains that the plaintiff met the diagnostic criteria for PTSD.

I find that no reasonable jury could conclude that Dr. Rigueur was deliberately indifferent to the plaintiff's serious mental health condition when he failed to immediately diagnose the plaintiff with PTSD. There is no dispute that Dr. Rigueur attempted to treat the plaintiff's symptoms of anxiety, depression, and sleep disturbances by prescribing various medications. When Dr. Rigueur learned the plaintiff believed he was suffering adverse side effects, he discontinued some medications and prescribed others to relieve the plaintiff of unwanted side effects and to address the plaintiff's persistent symptoms. When he later learned that the plaintiff was experiencing different negative side effects, he immediately discontinued the medication and tried yet another medication.

At every interaction with the plaintiff, Dr. Rigueur attempted to find medication to address the symptoms the plaintiff described. The plaintiff presents no evidence to suggest that Dr. Rigueur knew before March 20 that the plaintiff was suffering from PTSD, nor does the plaintiff present evidence to suggest that treating the plaintiff's symptoms in

the way he did rather than immediately diagnosing PTSD was such a departure from accepted professional practice that a jury could infer indifference. Accordingly, Dr. Rigueur is entitled to summary judgment on this claim.

Next, the delays the plaintiff experienced in connection with his medication and appointments are insufficient to establish that Dr. Rigueur was deliberately indifferent because Dr. Rigueur was not provided with the plaintiff's HSRs when health services received them and he had no control over when nursing staff would schedule appointments. Deliberate indifference requires a subjective awareness of the risk faced by the plaintiff. Here, the plaintiff provides no evidence to rebut Dr. Rigueur's assertions that he did not know about the plaintiff's complaints of unwanted side effects until he discussed them with the plaintiff, and, at that point, he immediately adjusted the plaintiff's medication.

Further, the plaintiff presents no evidence to rebut Dr. Rigueur's assertions that nursing staff triaged incoming HSRs and decided who should see him and when. Accordingly, he did not know about the plaintiff's repeated requests for an appointment or that the plaintiff was made to wait so long for an appointment. While Dr. Rigueur acknowledges that there is a shortage in psychiatric coverage and so knows that his patients to do not get to see him as quickly as they would like, there is no evidence suggesting that he is responsible for that shortage.

In short, Dr. Rigueur cannot be deliberately indifferent to delays that he did not know about and was not responsible for. Accordingly, he is entitled to summary judgment on these claims.

## ORDER

**THEREFORE, IT IS ORDERED** that the defendants' motions for summary judgment (Docket Nos. 44, 49) are **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The clerk's office shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 18th day of January, 2019.


 s/Lynn Adelman
LYNN ADELMAN
United States District Judge